UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 26-CR-175 (JRT/ECW) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **HESTER WEIHMANN'S RESPONSE** |
| | ) | **IN OPPOSITION TO** |
| HESTER SOPHIA WEIHMANN, | ) | **GOVERNMENT'S MOTION TO** |
| | ) | **DISQUALIFY DISTRICT COURT** |
| Defendant. | ) | **JUDGE** |

Defendant Hester Weihmann respectfully submits this response, opposing the government's motion to disqualify the United States District Court Judge randomly assigned to this criminal case, (ECF 17), the Honorable John R. Tunheim, Senior United States District Judge, District of Minnesota ("Judge Tunheim"). The government's motion fails to state the relevant legal principles, omits the necessary factual context, and otherwise presents an unconvincing case for recusal. Whether the government's purpose is to engage in impermissible "judge shopping," or merely to make some kind of improper statement, its motion threatens the rights of Ms. Weihmann, and for the reasons discussed below, the motion must be denied.

## I. RECUSAL STATUTE

For the statutory basis for its motion, the government cites the federal recusal statute which provides: "Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). (ECF 17, at 3-4.) The government also quotes the generalized formulation by which to decide such a recusal motion, *i.e.,* "whether the judge's impartiality might reasonably be

questioned by the average person on the street who knows all the relevant facts of a case." *United States v. Delorme,* 964 F.3d 678, 681 (8th Cir. 2020) (citation omitted). However, the government then fails to present a full and fair statement of the "relevant facts of [the] case" or analyze these facts in light of the relevant legal principles.

## II. FACTUAL BACKGROUND

A recusal motion is not limited to the self-serving "facts" advanced by the movant, but rather requires examination of "all the relevant facts," *Delorme,* 964 F.3d at 681, which are summarized here.

The government's sole factual basis underlying its § 455(a) recusal motion stems from an article published in the *New York Times* newspaper, dated September 17, 2026, and titled "Trump's Minnesota Surge Threatened Democracy, Judge Warns" ("Article"). (ECF 17, at 2.) The main focus of the Article involves a category of legal actions filed in United States District Court for the District of Minnesota ("District Court") arising from government's enforcement of the Immigration and Nationality Act ("INA"), all during the course of its widely-publicized Operation Metro Surge in Minnesota from approximately December 2025 through February 2026. (Ex. A.) While a full accounting of Operation Metro Surge is beyond the scope of this response, the operation resulted in thousands of INA-based administrative detentions, and a similar number of 28 U.S.C. § 2241 Petitions for Writ of Habeas Corpus ("Habeas Petitions"), filed in District Court.

### A. Habeas Petitions

The Article discusses the government's conduct in connection with Habeas Petitions filed during Operation Metro Surge, and in particular its acknowledged non-compliance

with District Court orders resulting from those petitions. (Ex. A.) As its title suggests, the Article's focus was on the orders of the Honorable Patrick J. Schiltz, United States District Judge and former Chief Judge for the District of Minnesota ("Judge Schiltz"). (*Id.*)

By January 2026, in connection with one particular Habeas Petition to which he had been assigned, Judge Schiltz noted the government had failed to comply with an order in that case—as it had on numerous prior occasions—resulting in grave harm to Petitioners:

> This is one of dozens of court orders with which respondents have failed to comply in recent weeks. The practical consequence of respondents' failure to comply has almost always been significant hardship to aliens (many of whom have lawfully lived and worked in the United States for years and done absolutely nothing wrong): The detention of an alien is extended, or an alien who should remain in Minnesota is flown to Texas, or an alien who has been flown to Texas is released there and told to figure out a way to get home.
>
> This Court has been extremely patient with respondents, even though respondents decided to send thousands of agents to Minnesota to detain aliens without making any provision for dealing with the hundreds of habeas petitions and other lawsuits that were sure to result. Respondents have continually assured the Court that they recognize their obligation to comply with Court orders, and that they have taken steps to ensure that those orders will be honored going forward. Unfortunately, though, the violations continue.

(Ex. B, at 2.) Judge Schiltz thus ordered the Immigration and Customs Enforcement ("ICE") official in charge of the challenged detentions to appear and show cause why he should not be held in contempt for the violation in the case at hand, absent a stipulation confirming the Petitioner had been released from custody per the Court order. (*Id.* at 2-3.) At the same time, Judge Schiltz "express[ed] appreciation" to government attorneys "who have struggled mightily to ensure that respondents comply with court orders[.]" (*Id.* at 2.)

The stipulation for release was eventually filed in that particular case, but noting the ongoing pattern of non-compliance by the government in similar cases, Judge Schiltz gave the government fair warning as to the consequences of continued violations of court orders:

> That does not end the Court's concerns, however. Attached to this order is an appendix that identifies 96 court orders that ICE has violated in 74 cases. The extent of ICE's noncompliance is almost certainly substantially understated. This list is confined to orders issued since January 1, 2026, and the list was hurriedly compiled by extraordinarily busy judges. Undoubtedly, mistakes were made, and orders that should have appeared on this list were omitted.
>
> This list should give pause to anyone—no matter his or her political beliefs—who cares about the rule of law. ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence. The Court warns ICE that future noncompliance with court orders may result in future show-cause orders requiring the personal appearances of [the ICE official] or other government officials. ICE is not a law unto itself. ICE has every right to challenge the orders of this Court, but, like any litigant, ICE must follow those orders unless and until they are overturned or vacated.

(Ex. B, at 5-6.) The list of "Habeas Cases with Order Non-Compliance" included cases assigned to multiple District Court Judges, not just Judge Schiltz. (*Id.* at 8-11.)

Subsequently, "the government's response to the Court's order was not to do a better job complying with court orders, but instead to attack the Court," observed Judge Schiltz in a Supplemental Order. (Ex. B, at 13.) Specifically, the government submitted a letter that "accused the Court of wildly overstating the extent of ICE's noncompliance with orders," though not denying there was at least some non-compliance. (*Id.* at 13-14.) Judge Schiltz conducted further inquiry regarding Habeas Cases assigned to multiple District Court Judges sitting in the District of Minnesota and documented widespread non-compliance—both before and after his prior orders noted above. (*Id.* at 14-52.) Judge

Schiltz concluded: "This Court will continue to do whatever is required to protect the rule of law, including, if necessary moving to the use of criminal contempt. One way or another, ICE will comply with the Court's orders." (*Id.* at 17.)

### B. The Article

The above orders of Judge Schiltz provide the necessary context for the Article at issue here. The substance of the Article may be summarized as:

(i) A brief recap the government's non-compliance with District Court orders during Operation Metro Surge, including Judge Schiltz's commentary which echoes the above judicial orders (Ex. A, at 2-3);

(ii) A notation that seven District Court Judges spoke to Article's author, with the express purpose to educate the public about "judicial independence" and the "rule of law" (*id.* at 4-6);

(iii) A factual discussion of civil unrest that occurred during Operation Metro Surge, and the challenging impact these events had upon the District Court, including its judicial officers and staff (*id.* at 6-10);

(iv) A factual discussion of the flood of Habeas Petitions filed with the District Court as a direct result of the Operation Metro Surge, including Petitioners with no criminal history (*id.* at 10-12);

(v) A factual discussion of lawsuits relating to the government's conduct during Operation Metro Surge, including rulings by a number of District Court judges regarding unusual tactics designed to evade judicial scrutiny in the manner of "a game of keep away," as stated in one District Court decision (*id.* at 12-14);

(vi) A factual discussion that following Judge Schiltz's series of orders above, that "judges in other districts around the country began using their rulings to sound the same alarm—the administration's approach to detaining immigrants was jeopardizing the rule of law" (*id.* at 15-17); and

(vii) Ultimately, "in many cases, the administration eventually fixed the issues [Judge Schiltz] had flagged" (*id.* at 9).

### C. Judge Tunheim

As demonstrated above, the focus of the Article was on Judge Schiltz and his admonitions to the government that it must comply with judicial orders, in accordance with the "rule of law." (Ex. A.) However, in this case, the government seeks recusal of Judge Tunheim rather than Judge Schiltz. Judge Tunheim's directly attributable contributions to the Article are limited to the following:

> Homeland security officials claimed that the agency was targeting immigrants who were the "worst of the worst." But the district court's judges said most of the detainees who appeared on their docket seemed to be ordinary people with homes and jobs. "They weren't arresting, in my view, people who were dangerous criminals on the street," said Judge John R. Tunheim, who was appointed by Bill Clinton.

(Ex. A, at 11.)

### D. Judicial Misconduct Complaint

After publication of the Article, the government filed (and widely publicized via its official website) a judicial misconduct complaint with the Eighth Circuit, naming Judge Schiltz, Judge Tunheim, and "anonymous judges" sitting in the District of Minnesota. (Ex. C, at 2.) The focus of the complaint was on the rulings and comments of Judge Schiltz, and to a much lesser extent those of Judge Tunheim. (*Id.* at 5.) The government's complaint asserts that the comments violate the Code of Conduct for United States Judges, particularly Canon 3(A)(6) which provides that "a judge should not make public comment on the merits of a matter pending or impending in any court." Buried in the midst of the complaint is the government's admission of "several instances of unintentional non-compliance with court orders." (Ex. C, at 8.)

Following the government's self-publicized complaint, a large number of former federal and state judges submitted a response to the Eighth Circuit, in the manner of *amici curiae*. (Ex. C, at 10-23.) The submission noted the government has recently filed similar complaints against sitting judges, which were rejected under the rationale that "a judge's expression of anxiety about executive-branch compliance with judicial orders" does not violate the Code of Conduct. (*Id.* at 12.) Moreover, the judges' remarks contained in the Article: (i) did not present commentary on the merits of any pending matter and thus fell outside the purview of the cited Canons; (ii) primarily involved "independence of the judiciary" and the "rule of law," which are topics permitted for public comment under the Canons; and (iii) are neither "partisan" nor "create a reasonable appearance of partiality," particularly given the focus upon the rather uncontroversial notion that parties (even and especially the United States government) are obligated to follow court orders. (*Id.* at 12-16.)

**E. Sophia Weihmann**

Unrelated to all of the foregoing, this case involves the government's criminal prosecution of Defendant Sophia Weihmann. On September 24, 2026, Ms. Weihmann was indicted on two charges relating to voter fraud. (ECF 1). The government alleges that in November 2024, Ms. Weihmann violated 18 U.S.C. § 1015(f), which prohibits any person from "knowingly mak[ing] any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election," and 18 U.S.C. § 611, making it "unlawful for any alien to vote in any election" involving certain federal offices.

## III. APPLICATION OF THE LAW

In all its pages targeting Judge Tunheim, the government makes virtually no effort to connect its complaints to the criminal case it has brought against Ms. Weihmann—a private individual who has nothing to do with Operation Metro Surge, the related Habeas Petitions, the government's violations of Operation Metro Surge-related court orders, or the Article at issue. In pursuit of its own goals, the government completely ignores Ms. Weihmann's rights to Due Process and a fair trial.

"It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876 (2009) (quotation modified). Relatedly, courts have recognized that the practice of prosecutorial "judge shopping" or "steering" raises serious due process and/or fairness concerns, including: (i) affording "the government an unfair advantage in litigating the case"; (ii) risk of "abuse of the judicial system"; (iii) creating the "unsightly" appearance of "some unspoken understanding or shared values that led the prosecutor to select the particular judge"; and (iv) threatening "the independence of the judiciary" by effectively placing the government in charge of judicial assignments, thereby incentivizing judicial officers to make government-favorable rulings. *United States v. Pearson,* 203 F.3d 1243, 1257-60 & 1263-64 (10th Cir. 2000).

The government's motion—seeking disqualification of Judge Tunheim to be replaced with some other judge more acceptable to the government—certainly implicates some of these concerns as to Ms. Weihmann in this case. Thus, Ms. Weihmann's constitutional rights require that the Court deny the government's motion absent

compelling reasons that strictly meet all the § 455(a) requirements for recusal, outlined next.

### A. Legal Principles Governing § 455(a) Recusal Motions

The legal principles that the Court must consider in deciding a § 455(a) recusal motion include:

*Presumption of Impartiality & Standard of Proof.* "A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *United States v. Delorme,* 964 F.3d 678, 681 (8th Cir. 2020) (citation omitted). "The question is whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." *Id.* (citation omitted).

*Impartiality.* Under § 455(a), a "bias or partiality motion" of the kind at issue here requires the movant to prove the judge has displayed "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555 (1994). Thus, to establish bias or prejudice based upon a judge's conduct, the movant "must show the judge had disposition so extreme as to display clear inability to render fair judgment." *United States v. Melton,* 738 F.3d 903, 905 (8th Cir. 2013) (quotation modified). "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger are not sufficient to require recusal." *Id.* (quotation modified).

*Reasonableness.* The recusal statute "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *White v. N.F.L.,* 585 F.3d 1129, 1138 (8th Cir. 2009) (citation omitted). Rather, the § 455(a) "reasonably"

language serves as a limiting principle to prevent a party from invoking the statute for that improper purpose. *See United States v. Cooley,* 1 F.3d 985, 993 (10th Cir. 1993). Courts have held that a number of situations will not ordinarily satisfy the disqualification requirements of § 455(a), including: (i) "rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters"; (ii) "the mere fact that a judge has previously expressed an opinion on a point of law or has expressed a dedication to upholding the law"; and (iii) "baseless personal attacks or suits against the judge by a party." *Id.* at 993-94 (quotation modified), *cited with approval in White,* 585 F.3d at 1138.

As shown below, application of these principles to all the relevant facts show the government's motion must be denied.

**B. The Article Involves Unrelated Litigation**

As discussed in the factual background above, the subject matter of the Article at issue is Operation Metro Surge, the Immigration and Nationality Act ("INA") detentions and removal proceedings that occurred during it, the resulting Habeas Petitions filed in the District Court, and the government's (admitted) failure to follow court orders in connection with those same Habeas Cases.

Ms. Weihmann's case has no factual connection to Operation Metro Surge. It does not involve INA detention or removal. It does not involve a Habeas Petition. Rather, this case is a criminal case alleging the Ms. Weihmann violated two criminal statutes over a year before Operation Metro Surge began. This criminal case is completely unrelated to the Article, to any comments by Judge Tunheim from the Article or elsewhere, or to any of the government's complaints about the Article. For this reason, the government's recusal

motion must fail. *See, e.g., Veneklase v. City of Fargo,* 236 F.3d 899, 900-02 (8th Cir. 2000) (Bye, J.) (denying recusal motion where judge's former law firm had previously represented third party witness in completely unrelated litigation); *In re Apex Oil Co.*, 981 F.2d 302, 304 (8th Cir. 1992) (Loken, J.) (denying recusal motion where judge's former law firm had engaged in tangential litigation that was nevertheless "completely unrelated to the supplier contract claims at issue in this case"); *see also Rodgers v. Knight,* 781 F.3d 932, 943 (8th Cir. 2015) (mere fact that party's counsel had "filed a judicial complaint against the district judge in a previous, unrelated litigation is insufficient to establish that the judge's impartiality in this matter might reasonably be questioned").

**C. The Article Involves Factual Observations Made in a Judicial Capacity**

With respect to Judge Tunheim, the Article contains nothing more than observations made in his judicial capacity concerning: (1) the criminal histories of at least some Habeas Petitioners detained during Operation Metro Surge and appearing before him; and (2) indirectly (via lists contained in Judge Schiltz's orders) the government's violations of District Court orders. Neither presents a valid reason for recusal.

First, evidently referring to Operation Metro Surge-era Habeas Petitioners assigned to him, Judge Tunheim is quoted in the Article to comment: "[ICE wasn't] arresting, in my view, people who were dangerous criminals on the street." (Ex. A, at 11.) The government asserts the quoted comment is (at least partially) inaccurate. Even if so, the comment qualifies as an "opinion formed by the judge" on the basis of prior judicial proceedings, and any such opinions "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment

impossible." *United States v. Denton,* 434 F.3d 1104, 1111 (8th Cir. 2006). For example, the Eighth Circuit has held a judge's comment based upon observations of trial testimony that "there was nothing impairing [the defendant's] ability" does not require recusal in subsequent competency proceedings regarding that same defendant where "[u]nder all the circumstance the comments by the trial court did not call into question its impartiality." *Id.* at 1009-12. The same is true here. The government offers no evidence that Judge Tunheim's quoted comment evinces "deep-seated favoritism or antagonism that would make fair judgment impossible," such as granting a Habeas Petition merely based upon the Petitioner's criminal history or lack thereof. And certainly not with respect to this case, which has nothing to do with Operation Metro Surge, the INA, or any related Habeas Petition. The government's rationale on this point must be rejected.

Second, though the Article contains no further quotation attributed to Judge Tunheim, the government claims some sort of agreement by Judge Tunheim (in light of his participation in the interview) that the government had violated numerous District Court orders in the Operation Metro Surge-era Habeas Cases. Even if this were true, the Eighth Circuit has properly classified such judicial commentary as "historical" in nature and has held recusal unnecessary because the "average person would be aware of the fact that the district judge's comments referred to rulings that he made many years earlier and related to matters long since resolved" and hence would not "interpret the comments as reflecting bias." *White v. N.F.L.,* 585 F.3d 1129, 1139 (8th Cir. 2009). This reasoning is even more applicable here because the commented-upon violations involve Operation Metro Surge-

era Habeas Petitions in unrelated litigation and have nothing to do with this criminal case. Again, the government's rationale must be rejected.

**D. The Article Does Not Evince Judicial Publicity-Seeking**

The government either disregards or ignores all of the above substantive points of fact and law, and instead focuses on what it views as violations of the judicial ethics canons involving "publicity-seeking," merely based upon Judge Tunheim's participation in the Article's production. But the government did violate numerous of District Court orders in connection with Operation Metro Surge-era Habeas Cases. Violations numbered in the hundreds, by Judge Schiltz's accounting from the time. (Ex. B, at 18-52.) And though it minimizes the scope and severity of its own violations, the government admits at least some amount of non-compliance, whether at the time of the violations, (Ex. B, at 14), in the Article itself, (Ex. A, at 4), or in its judicial complaint to the Eighth Circuit, (Ex. C, at 8 (admitting "several instances of unintentional non-compliance with court orders")). Thus, as both the Article and response to the government's complaint point out, the gist of the Article is a defense of "the independence of the judiciary" and advocacy for the "rule of law"—both of which are placed in jeopardy when the Executive Branch defies court orders as it admits happened here. And both of which are topics that judicial officers are permitted to address in public comments such as those contained in the Article. (Ex. C, at 14.)

The government's accusations against Judge Tunheim fail to establish any violation of the judicial canons, and, even if it were otherwise, any such violation stemming from Judge Tunheim's participation in the Article would pertain to Operation Metro Surge-era Habeas Petitions and not to this criminal case. In sum, when placed in the proper context

as required by the applicable § 455(a) test, the government's principal complaints against Judge Tunheim are unfounded and must be rejected.

## IV. CONCLUSION

For all the above reasons, Ms. Weihmann respectfully asserts that the government's motion for recusal presents a threat to her constitutional rights to Due Process and a fair trial and is meritless under the relevant facts and applicable law. She respectfully requests that the Court deny the government's motion.

Dated: November 12, 2026

Respectfully submitted,

*s/ Siri Carlson McDowell*

SIRI CARLSON MCDOWELL
Attorney ID No. 0401693
Attorney for Ms. Weihmann
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415