# *Trump's Minnesota Surge Threatened Democracy, Judge Warns*

In a rare interview, Patrick Schiltz, who served as the federal court's chief judge last winter, called the administration's actions "a grave threat to the rule of law."



In a rare interview, Patrick Schiltz, who served as the federal court's chief judge last winter, called the administration's actions "a grave threat to the rule of law."



**By Mattathias Schwartz**

Mattathias Schwartz visited the Twin Cities and spoke with Judge Schiltz and six other judges who serve on Minnesota's Federal District Court.

Sept. 17, 2026

Judge Patrick J. Schiltz's warning was stark.

Immigration and Customs Enforcement had violated nearly 100 orders issued by Minnesota's Federal District Court during the month of January, including some mandating the release of undocumented immigrants from detention.

The violations needed to stop immediately. "ICE is not a law unto itself," Judge Schiltz wrote in his Jan. 28 order.

Judges around the country took notice, not only of the scale of the allegation but because such a harsh reproach was coming from the pen of Judge Schiltz, a George W. Bush appointee with almost 20 years of experience on the bench. He clerked for Supreme Court Justice Antonin Scalia in the 1980s and has enjoyed close ties to the conservative legal establishment for decades. This was not the profile of a judge likely to engage in a high-stakes standoff with the White House.

In a rare 90-minute interview seven months later, Judge Schiltz said his order had been prompted by concern that the Trump administration's disregard for court orders was clogging his courthouse to a near standstill, contributing to rising tensions in the protest-filled city and, ultimately, putting the constitutional order at risk.




The legality of the administration's tactics during its immigration enforcement operation, known as Metro Surge, in Minneapolis early this year was challenged by a series of federal lawsuits. David Guttenfelder/The New York Times

What happened in Minnesota's federal court, he said, "created a grave threat to the rule of law."

He said he thought the violations were largely the result of incompetence and staffing shortages, but also worried that the Justice Department had not taken their corrosive effect seriously enough.

"I would say aloud to myself, 'This just never happens,'" he added, referring to the violated orders and other unusual behavior by the Justice Department. He was in his chambers, which has signed photos of Chief Justice John G. Roberts Jr. and Justice Samuel A. Alito Jr. on the wall. Earlier in his career, he helped found a law school at a Catholic university in Minneapolis, and wrote a renowned law review article about the moral perils of the legal profession.

Judge Schiltz, who served as the district's chief judge from mid-2022 through June 2026, declined to discuss ongoing cases. But he and six other members of Minnesota's federal bench agreed to speak to The New York Times about last winter's tumult, to describe how an intense national spotlight, a deteriorating relationship with the Justice Department and a flood of lawsuits had combined to put their court under tremendous pressure.

In the view of the Department of Homeland Security, it operates "in line with the U.S. Constitution and all applicable federal laws," said Chandler Rebel, a D.H.S. spokesman.

Kiersten Pels, a Justice Department spokeswoman, said the administration "will continue to fully comply with court orders." She asserted that in most instances where there was an issue, "the underlying substance of the order was satisfied even where a secondary deadline was missed."

Ms. Pels added that it she found it "remarkable that sitting federal judges are giving on-the-record interviews" criticizing the administration, and suggested that they consider recusing themselves if they "have made public comments on pending or related matters."

It is indeed unusual for federal judges to give extensive interviews that reflect on periods when their rulings have made headlines.




A memorial for Alex Pretti, one of two civilians killed by federal agents in January during the surge. Victor J. Blue for The New York Times

The seven judges who spoke to The Times were appointed by both Democratic and Republican presidents. They included six of the seven judges who held active status in Minnesota last winter.

“We are allowed to speak out about judicial independence,” said Judge Nancy E. Brasel, whom Mr. Trump appointed in 2018. “And so we should, in order to keep it.”

The tensions in Minnesota eased after the administration announced an end to its surge in mid-February, following the killings of two civilians by federal agents.

Judge Schiltz said he hoped the portrait of how the bench had handled the crisis would help Americans better understand how the United States’ system of government depends on the rule of law.

"The rule of law to democracy is like oxygen to a human body," he said. "It is something that you absolutely need to survive, and yet it's something that people just take for granted."

## Stirring the Pot

On Jan. 23, Judge Schiltz was at home cooking lunch when he received an email informing him the Trump administration had gone over his head to an appeals court.

Out in Minneapolis, ICE officers were arresting undocumented immigrants and putting them on planes bound for detention centers in Texas. It was the second month of Operation Metro Surge — the administration's latest push to flood a Democratic-led city with armed personnel tasked with delivering on Mr. Trump's campaign promise of mass deportations.

Tear gas filled the streets as protesters skirmished with uniformed D.H.S. personnel. Federal officers had already shot and killed one Minnesotan in her car; they would shoot and kill another during the coming weekend.




A confrontation between protesters and federal agents in late January. For the courthouse staff, the period had echoes of the civil unrest that followed the killing of George Floyd in 2020. David Guttenfelder/The New York Times

When a group of protesters disrupted a church service in St. Paul, the Trump administration sought warrants for their arrest, including Don Lemon, the former cable news host who has said he was reporting on the group as a journalist. One of Judge Schiltz's colleagues, Magistrate Judge Douglas L. Micko, had granted three of the eight warrants, but not the one for Mr. Lemon. (Judge Micko, who was not among the judges interviewed by The Times, declined to comment.)

Minnesota's U.S. attorney, Daniel Rosen, then took the unusual step of requesting that another judge review Judge Micko's decision. Judge Schiltz had told Mr. Rosen that he would decide on that after the bench met in person the following week.

That timeline wasn't fast enough for the Justice Department. The Jan. 23 email informed Judge Schiltz that the administration had gone around him. It had asked the U.S. Court of Appeals for the Eighth Circuit to force him to issue the other warrants. He had less than three hours to make his case to the appeals court for why it shouldn't intervene.

Outside, it was 20 degrees below zero. The cold had closed the daytime center that looks after Judge Schiltz's adult son, Peter, who has Down syndrome.

Judge Schiltz turned off the stove and settled Peter in his room with a movie. Then he went to his office.

"I had to sit down and represent myself," he recalled.

When Judge Schiltz found himself in the spotlight, he said he drew on his experience clerking for Justice Scalia, who he recalled was "utterly unmoved by criticism," and taught him that "you have to have a thick skin and, you know, uphold your oath."

That afternoon, Judge Schiltz fired off two letters to the appeals court. He disputed the government's claim that a warrant for Mr. Lemon's arrest was, in his words, a "national security emergency."

Justice Department officials were blasting Judge Micko, noting that his wife works in the office of Minnesota's attorney general, Keith Ellison, a Democrat.

"I don't even want to say 'judge,'" Harmeet K. Dhillon, a senior department official, said in an interview that day with the journalist Megyn Kelly. Judge Micko, she said, "exhibited bias."

The condemnation of Judge Micko by Trump-aligned media outlets was followed by a series of violent threats, which have not been previously reported. In the interview, Judge Schiltz revealed that Judge Micko and his family had to be moved to a secure location, where they remained for several days. Judge Schiltz said that the administration's statements were part of what had put Judge Micko in danger.

The Eighth Circuit sided with Judge Schiltz, rejecting the government's request. But the administration eventually got the additional warrants through a different route, by convening a grand jury. Months later, another judge is reviewing that process to see if prosecutors may have misinstructed the grand jury.

The cases cited in Judge Schiltz's January list of violations have largely concluded, and in many cases, the administration eventually fixed the issues he had flagged.

## The 'Worst of the Worst'

For the clerk of court, Kate M. Fogarty, Operation Metro Surge brought echoes of the fraught atmosphere that followed the killing of George Floyd in 2020. Even as public pressure on the court increased, she still had to monitor protests and handle shutdowns of the district's courthouses, sometimes with a few minutes' notice.

"You've got thousands of people demonstrating outside your window, whistles blowing nonstop," Ms. Fogarty said. "And an inbox full of critical cases that need to be assigned."




In late January, thousands gathered in downtown Minneapolis to protest federal immigration operations.
David Guttenfelder/The New York Times

By late January, the immigration sweeps had led to hundreds of habeas corpus petitions — lawsuits from detainees demanding to be set free. Previously, undocumented immigrants could generally go on living in their communities for years while challenging deportation in immigration court. Then the Trump administration decided they could be detained as if they were still seeking admission to the United States.

During the first three months of 2025, Minnesota's Federal District Court fielded two habeas corpus petitions. Over the same period in 2026, it received 1,116 of them. The clerk's office stayed open 16 hours a day, seven days a week to process incoming petitions. None of the district court's employees receive overtime, so the court's staff were essentially working as volunteers.

Homeland Security officials claimed that the agency was targeting immigrants who were “the worst of the worst.” But the district’s judges said most of the detainees who appeared on their dockets seemed to be ordinary people with homes and jobs.




Federal agents attempting to extract an unidentified man from a vehicle in January during Operation Metro Surge. David Guttenfelder/The New York Times

“They weren’t arresting, in my view, people who were dangerous criminals on the street,” said Judge John R. Tunheim, who was appointed by Bill Clinton.

District court judges work alone, but as the number of cases ramped up, the judges recalled seeking one another’s counsel, meeting regularly and consulting in running email threads. Eventually, some of their clerks made an informal

spreadsheet showing whom to consult on particular legal questions. Some judges built templates of legal orders so they could respond quickly to some of the detention issues that were arising again and again.

The judges said they stayed glued to their devices, fearful of missing a petition. Judge Katherine M. Menendez said she responded to one request on her iPad from the coat room of a restaurant. At dinners with friends, Judge Schiltz said he would apologetically explain why he needed to check his phones constantly. “The cost of me enjoying a movie could be somebody waking up in New Mexico the next day when they shouldn’t have,” he recalled.

## A Game of Keep-Away

As tensions in the Twin Cities rose, the district’s judges were also facing many other kinds of lawsuits — over the government’s conduct toward protesters, the rights of legally admitted refugees, criminal charges against the protesters themselves, attempts by the Trump administration to subpoena state and local officials and some suits questioning whether the whole operation was legal in the first place. Any decision they made was potentially subject to appeal to the Eighth Circuit, where four of the 11 active-status judges were Mr. Trump’s appointees.

But some of the district court’s most significant curbs on Operation Metro Surge came from its own Trump appointees.



Mourners gathered in January at a memorial on the site of Mr. Pretti's killing. The administration announced an end to its surge in mid-February. David Guttenfelder/The New York Times

"Due process is not a game of keep-away," Judge Brasel wrote in a ruling requiring that detainees be given access to counsel.

Judge Eric C. Tostrud, who was appointed by Mr. Trump in 2018, issued a temporary order for the government to preserve evidence gathered at the scene where federal agents had shot and killed Alex Pretti, a protester.

Judge Tostrud, as the longest-tenured active judge, took over as chief this summer when Judge Schiltz decided to take senior status, a form of semiretirement. In an interview, he said that Judge Schiltz had been "the perfect person to lead us" during Operation Metro Surge. "Independent, brilliant, courageous. And not faint of heart."

Behind the scenes, the district's judges were dealing with a deluge of violent threats. After major rulings, the phones in judges' chambers would sometimes ring nonstop, with clerks logging hundreds of incoming communications each day. Judge Jerry W. Blackwell shared one anonymous email vowing to "kill u soon." The volume of hostile communications led the bench to create its own internal system for tracking people responsible for multiple threats, supplementing the U.S. Marshals Service, which normally handles judicial security.

The U.S. attorney's office, headed by Mr. Rosen, was losing career attorneys, some of whom quit in response to how the Justice Department was handling the civilian killings. The administration tried to shore up head count by borrowing lawyers from the Pentagon and the Department of Homeland Security. In a hearing before Judge Blackwell, one melted down, saying that the system was "broken."



Daniel Rosen, Minnesota's U.S. attorney, addressing members of the media in May. Operation Metro Surge put a heavy strain on the relationship between his office and the district's federal bench. David Berding/Getty Images

In the interview, Judge Schiltz said that normally government agencies act as "partners" to judges in tackling challenges to the system.

"But they weren't this time," he said. "We were really on our own."

## Anarchy or Authoritarianism

After Judge Schiltz's January warning, judges in other districts around the country began using their rulings to sound the same alarm — the administration's approach to detaining immigrants was jeopardizing the rule of law.

In West Virginia, a judge threatened to hold administration officials in contempt. In New Jersey, a judge ordered the Justice Department to make its own list of cases where it had failed to comply. In Texas, a judge decried the administration's actions, and what he called "the perfidious lust for unbridled power."

"If there is one single issue that would unite judges of all persuasions, it is the sanctity of court orders," said Judge J. Harvie Wilkinson III of the U.S. Court of Appeals for the Fourth Circuit, by email. Judge Wilkinson, appointed by President Reagan, is one of several Republican-appointed judges who have criticized the Trump administration in their rulings. "There is a brotherhood of judges on this question, of which Judge Schiltz is an esteemed and valued part."



When he became chief of Minnesota's federal court in 2022, Judge Schiltz said he wanted to be "the Benjamin Harrison of chief judges: one that no one remembers." Jenn Ackerman for The New York Times

In the interview, Judge Schiltz said that many of the government's violations of his court orders appeared to be inadvertent, the result of sloppiness and a lack of legal staffing to accompany the immigration surge.

"My impression was that most, if not all, of the noncompliance was due to incompetence," he said, "not due to conscious defiance of orders."

At the same time, he said, the violations needed to be taken seriously. The lack of resources led to a result, he said, that should have been anticipated, and that threatened the foundations of the legal system.

Obedience to court orders, Judge Schiltz said, is why people feel secure owning a home, saving money, getting married and having children.

"You walk down the street, and you assume you're generally safe because of the law," he said. "It's the rule of law. If you don't have it, you have either anarchy or you have authoritarianism. You have Russia or you have China or you have North Korea."

Ernesto Londoño contributed reporting.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Warning Call After a Surge In Minnesota